IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff<br><br>v.<br><br>[37] EMMANUEL TORRES SUÁREZ,<br><br>Defendant | CRIMINAL 07-0121 (ADC) |

MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

I. INTRODUCTION

On March 19, 2007, a grand jury indicted 42 individuals charging them with knowingly and intentionally conspiring, combining, and agreeing with each other and with others known and unknown to the grand jury to knowingly and intentionally possess with intent to distribute in excess of one kilogram of heroin, in excess of five kilograms of cocaine, in excess of 50 grams of cocaine base, and in excess of one hundred kilograms of marijuana.  Evidence which the United States seeks to introduce into evidence against Emmanuel Torres Suárez was seized on July 31, and October 22, 2003.  This matter is before the court on motion to suppress that evidence.  The motion to suppress was filed by co-defendant Emmanuel Torres Suárez on November 16, 2007. (Docket No. 623.) The United States filed a motion in opposition on December 14, 2007. (Docket No. 721.)

CRIMINAL 07-0121 (ADC)                              2

## II.  FACTS

The facts to follow were derived from the defendant's motion to suppress. According to the defendant, police officers intervened with him, searched him and the premises where he was located, and on both occasions seized narcotics from him.  The officers did not have a search warrant, and arguably did not have probable cause to arrest him.

The officers arguably saw the defendant conducting a drug transaction.  On October 22, 2003, the officers arguably saw him holding a plastic bag which arguably contained narcotics, while he was standing on a third floor balcony.  The defendant attested on November 16, 2007 that on July 31, 2003, he was residing at the Jardines de Guamaní Housing Project, Building 1, Apartment 5, and that at about 2:00 P.M. he exited the apartment and was walking toward the second entrance to the housing project when he was ordered to stop by police officers. He was then pushed against a patrol car and searched, and then beaten. Neighbors began to yell for them to leave him alone.  Some neighbors were then arrested and charged.  The defendant was charged with possession with intent to distribute narcotics to another person, Edward Duprey.  The defendant alleges that there was no probable cause to detain or arrest him, and denies delivering any narcotics to anyone.

CRIMINAL 07-0121 (ADC)                    3

On October 22, 2003, at about noon, the defendant was at home when there was a knock at the door. He opened the door partially and saw an officer in the Special Operations Unit. He asked the agent if he had a search warrant, and as the agent tried to force his way in, the defendant was able to close the door. Moments later, an agent broke the lock of the door with a sledgehammer. Close to twelve agents came into the apartment and started to beat him. He was thrown to the floor and handcuffed. The agents started to search the apartment and the defendant asked them if they had a search warrant. His mother arrived fifteen minutes later. An agent told her that they were entering the housing project and saw the defendant on the balcony of the third floor apartment holding a plastic bag containing what they believed were drugs. The agents searched for about 40 minutes and found nothing. They then pulled out the toilet in the bathroom. They took him to police headquarters and took the toilet in a different police car. At the police station, they broke the toilet with a sledgehammer and a plastic bag containing cocaine and marijuana showed up. The defendant was then charged. The defendant denies having a bag on the balcony.

III.  FACTUAL BACKGROUND

At the evidentiary hearing held on January 14, 2008, Officer Tommy Hernández Santiago, badge No. 21254, testified that he is a police officer in Puerto Rico and has been so for 13 years. He presently works at the illegal

CRIMINAL 07-0121 (ADC)                    4

weapons division.  In 2003, he was assigned to the Special Operations Unit in Guayama, and had been assigned to the division for five or six years.  He worked primarily on places of high drug incidents and drug points.  The division members would conduct surveillance and conduct searches.

On the morning of October 22, 2003, he clocked in and while having lunch with other agents, he finished and returned to the Special Operations Unit office to pick up some records to return to the courthouse.  One of the officers had to summons a person at the Jardines de Guamaní Housing Project.  Riding in an official vehicle, at the first entrance to the project, they turned right.  Referring to Exhibit 1, he explained  how the agents (José Báez driving, and Marilyn Torres in the back of the car, a Crown Victoria marked car) arrived at the first entrance (the one closest to Road No. 3).  He noticed two individuals and then saw the defendant coming down the stairs of the first building with a clear ziplock bag, 6" x 6" in his hands about 30 to 40 feet away.  The officer could see cylinder containers with black caps with white dust, apparently cocaine, and clear reddish plastic small bags.  The defendant looked up from looking at the bag and saw the officers.  Officer Hernández told Officer Báez to stop the car.  Officer Hernández got out of the car and started running after the defendant.  The defendant also ran and got up to the third floor, and the agent caught up to him.  They both struggled at the door to the defendant's apartment.  The defendant entered the


CRIMINAL 07-0121 (ADC)　　　　　　　5

apartment and the officer then entered behind him. They both struggled at the bathroom door, and then entered the bathroom. Once inside the bathroom, the defendant dropped the bag into the toilet and flushed the water tank. Everything took one to two minutes. After the defendant flushed the toilet in the bathroom, the agent pulled the defendant out of the bathroom and placed him under arrest. The officer then radioed and said he needed support. Officer Báez arrived soon thereafter as well as other units. Officer Hernández then called his supervisor to inform him. The defendant's mother then arrived, and officer Hernández left the apartment and went to the management office of the project to ask for permission to remove the toilet. The officers would flush the toilet and the water would not go down so the drugs were still there. The toilet bowl was then removed and taken in the same vehicle as the defendant to the police headquarters. In the defendant's presence, the toilet was cracked open and the agents were able to seize the same plastic bag that was dropped in the toilet.

　　　　Referring to Exhibits 2, 3, and 4, Officer Hernández noted the location where the bag was stuck in one of the curves of the toilet. Exhibit 3 shows him taking out the bag containing the controlled substances. Exhibit 4 shows the controlled substances seized and $127 taken from the defendant. Once the bag was seized, the evidence was taken to drugs headquarters at Guayama and field tests were

CRIMINAL 07-0121 (ADC)　　　　　　6

performed, which tests proved positive for cocaine and marijuana.  The drugs were then secured.

　　Agent Marilyn Torres intervened with the two young men whom Officer Hernández first sighted, but no charges were brought as to them because the prosecutor declined.  One of those men was called Eli, a name the officer did not recall mentioning in a sworn statement given in Guayama.  The officer explained that if a search warrant were to have been sought, the defendant would have been able to get rid of the contraband. Officer Hernández has worked in Guayama for eight  years and has been to the Jardines de Guamaní Housing Project  many times.  Prior to this time, the officer does not remember intervening with the defendant although he has done so after this occasion.  When he first saw the defendant, the  defendant was located in front of the stairs of the first building and was close to the last step at the bottom.  The officers were not conducting surveillance at the time although when Officer Hernández enters a housing project, he always looks at the drug points (which move around) for his own security and that of his fellow officers.  When the car stopped, the officer got out and started running and so did the defendant, both running toward the third floor. The officer wore black BDU (battle dress uniform) and lightweight boots.  The officer first reached the defendant at the door to the defendant's apartment.  Once the defendant was placed under arrest, Officer Hernández called Agent Báez using

CRIMINAL 07-0121 (ADC)                    7

a portable police radio to call him.  The officer also had a 9mm pistol with him, which he never took out of his holster.  Officer Báez arrived within seconds of being called, and was in front of the stairwell when called.  The other agents arrived minutes later.  Officer Hernández denied having to break the door to enter the apartment.  The apartment was not searched.  The Jardines de Guamaní Housing Project is about five minutes from the courthouse, maybe less.  Nobody decided to seek a search warrant.  The situation did not warrant seeking a search warrant, in Officer Hernández' mind.

Referring to December 16, 2003, and Officer Hernández' testimony at a suppression hearing held in local court, the officer did not recall such hearing.  The officer did not recall being confronted with the evidence that the door had been broken with a sledgehammer.  Referring to Exhibit A, Officer Hernández did not recall being confronted with the door being broken with a sledgehammer, and did not recall testifying in a hearing of the Guayama Superior court.  Referring to I.D. B, Officer Hernández reviewed the same, saw his name in the minutes of December 16, 2003 and yet did not recall testifying at such hearing in front of a judge named Israel Hernández González.

Defense counsel walked to the exit of courtroom and Officer Hernández said he was about that distance from the defendant when first sighted.  The officer

CRIMINAL 07-0121 (ADC)                    8

testified that he could see the content of the transparent bag.  The smaller bags inside the larger one were 1" x 1", transparent and reddish.

Irving O'Fray Vázquez, FBI agent, testified in relation to a Guayama case about facts which occurred on October 22, 2003.  The agent testified that some time ago he received certified copies of court documents regarding this defendant and the same reflect that in regards to the events which occurred on that date, the defendant pleaded guilty.  Looking at I.D. B, the agent reviewed the same.  He noted that the minutes he reviewed talked about all of the defendant's cases.  He could not identify I.D. B.  The defendant pleaded guilty to simple possession in the local cases.

Police Officer Harold Ortiz testified that he has been a policeman for 21 years and is assigned to Arroyo.  In 2003, he worked in Guayama at Special Operations, and his duties included making protective rounds, seizures and the surveillance of drug points. On July 31, 2003, he started work at 6:00 A.M. at the Special Operations Unit.  At about 1:00 P.M., he met with Sergeant Rodríguez to give surveillance at the Jardines de Guamaní Housing Project.  They went to a location to observe the drug point (making reference to the right side corner of the project in Exhibit 1) which drug point moves and is not in one place.  From outside the housing project, they  looked through binoculars to see what was going on.  The officers saw a man in a red T-shirt carrying a transparent bag with

CRIMINAL 07-0121 (ADC)                  9

cylinders with purple caps about 60 or 70 feet away. A man in a white T-shirt gave a man in a blue shirt some money. The man in the blue shirt then called the defendant. The man in the red T-shirt had the clear plastic bag. He then got close to the men wearing white and blue, and took from the transparent bag one or two cylindrical containers and gave them to the man with the white T-shirt who then walked away. Then another man arrived, wearing a striped shirt, gave money to the man in the blue shirt, who in turn called the man in red, who appeared with a man wearing a gray T-shirt. The man in red reached into the clear bag, and took out a cylinder or cylinders and gave the same to the man in the striped shirt. The man in red was dealing the drugs; this was the defendant. Officer Ortiz then gave the ok for the officers to arrest the people for drug transactions. The defendant hid in the stairwell between the two buildings. There were five or six persons. There were six to nine agents supporting the action. Others were in patrol cars at a distance. All the people were arrested by the police, who came into the project through the fence. The defendant was also arrested. Officer Ortiz later saw the defendant at the Special Operations Unit. Officer Laboy was the one who placed him under arrest.

On cross-examination, Officer Ortiz noted that he had never given surveillance to the Jardines de Guamaní Housing Project before, although he knew the place from making preventive rounds. He did not know how far away the

CRIMINAL 07-0121 (ADC)                    10

other agents were from him.  Officer Ortiz got out of the van noting the top of Exhibit 1 at the end of the road and walked to the surveillance point (through the brush) which is not difficult since he was raised in the country.  It took about 15 minutes to get to the surveillance point.  The radio that he used was a regular police phone and he used it with head phones.  The surveillance lasted a total of 40 to 45 minutes.  Officer Ortiz had previously seen the defendant, about one or two weeks  before.  When he left the area, about half-way to road No. 3, he recalled hearing a 10-30 (officer needs assistance) where a riot was occurring.  He left the area walking and was picked up (at bottom of Exhibit 1, near road No. 3).  He was 200-300 feet away from the riot but had no visibility of the area because of the buildings.  He did not go to help in the riot so as not to be discovered.  By the time he got to road No. 3, the riot was over and the officers had left.

Officer Javier Laboy Montáñez testified that he has been a policeman for 13 ½ years and is with Guayama homicide.  In 2003, he was with the Special Operations Unit in Guayama.  In particular on July 31, 2003, he became familiar with the defendant.  He began working at 6:00 A.M.  At 1:00 P.M., Sergeant Rodríguez gave instructions to conduct a surveillance at a drug point at Jardines de Guamaní Housing Project, also known as El Drive-In.  After planning the surveillance, the agents were driven nearby and at about 2:10 P.M. they went to

CRIMINAL 07-0121 (ADC) 11

the drug point, located at the first floor apartment of the corner building (Exhibit 1), right.  He proceeded to the end of the street and they all walked through the bushes and he got to a position near the drug point.  Officer Laboy listened to Agent Ortiz who was surveilling and was in the best location.  At 2:15 P.M., Officer Laboy heard that Ortiz had seen a drug transaction.  He said the main pusher had a red and black polo, long blue jeans, was dark skin, tall, and skinny; another man was wearing a blue T-shirt, thin, and another man was wearing a grey T-shirt, multi-color cap, and blue jeans, and the last two helped the man wearing the red polo in conducting the drug transactions.  The one with the white T-shirt and blue jeans had left the drug point.  At 2:20 P.M., Ortiz said that another man had arrived, wearing a  striped T-shirt, and long jeans.  The man in grey handed over drugs.  Officer Ortiz said to arrest them all.  The officers placed them under arrest.  Officer Laboy arrested the man in the red polo, the defendant, as well as the man in a grey T-shirt.  Officer Laboy also seized a clear plastic bag, 25 transparent cylinders, with purple caps, with crack inside.  The man in grey was carrying $150 on him.  There were many people involved, about 15 to 20 persons.  There were seven to nine agents on surveillance, and five or six that arrived.  From beginning to end, the entire incident took 50 minutes to an hour.  After positioning, he heard Officer Ortiz five minutes later.

CRIMINAL 07-0121 (ADC)				12

On cross-examination, Officer Laboy noted that there was a riot after they were arrested and before getting to the drug division in Guayama.  There was a total of five minutes of surveillance altogether.  Harold Ortiz saw it.  Officer Laboy made the arrest with "transferred motive (motivo transferido)," that is based upon the probable cause established by Officer Ortiz' observations.  Making reference to I.D. C, his own sworn statement, it is noted that Officer Ortiz took charge of the investigation  because he was the best located, and that at 2:15 P.M., Officer Ortiz let them know that the pusher was tall, thin, wearing a red/black short sleeve polo, long jeans, of dark complexion (tez trigueña oscura), and that he had sold drugs to the man wearing jeans and a white T-shirt, who later left the place.  Officer Ortiz did not give a description of the impressive tattoos on both arms of the defendant, as observed in court.

The officer explained that the residents wanted to take the detainees away from them, something which is normal since they always want to do that.  They said that those people (the detainees) were living there.  Officer Laboy left with the detainees when the riot started and did not recall if the rioters were arrested.

The United States ripostes to the argument of the defendant that on July 31, 2003, the defendant was spotted conducting a drug transaction in the Jardines de Guamaní Housing Project.  He immediately attempted to flee.  The police initiated a pursuit and the defendant ran into an apartment.  The officer following him

CRIMINAL 07-0121 (ADC)			13

entered the apartment in hot pursuit to conduct the arrest.  The defendant was arrested and charged.  On October 22, 2003, he was again observed committing a felony.

Both scenarios reflect the daily rigors and challenges of being a policeman in Puerto Rico and scenes that might be considered worthy of being performed in movie theaters are daily played out on the streets.  With this in mind, it is important to determine "whether there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant."  United States v. Adams, 621 F.2d 41, 44 (1st Cir. 1980).  "To effectuate this inquiry, we consider factors such as the following:  'the gravity of the underlying offense; whether delay poses a threat to police or the public safety; whether there is a great likelihood that evidence will be destroyed if there is a delay until a warrant can be obtained.'"  United States v. Curzi, 867 F.2d 36, 41-42 (1st Cir. 1989) (quoting United States v. Veillette, 778 F.2d 899, 902 (1st Cir. 1985)).

## IV.  EXIGENT CIRCUMSTANCES

The United States argues in one case that the agents were in hot pursuit of the defendant justifying the failure to secure a search warrant for the toilet.  In Mincey v. Arizona, 437 U.S. 385, 393 (1978), the court acknowledged the right of police to respond to emergency situations "threatening life or limb" indicating that police may conduct a warrantless search provided that the search is "strictly

CRIMINAL 07-0121 (ADC)			14

circumscribed by the exigencies which justify its initiation." Id. (quoting Terry v. Ohio, 392 U.S. 1, 25-26 (1968)), cited in Georgia v. Randolph, 547 U.S. 103, 113 n.3 (2006). "Exigent circumstances" have traditionally been found in those crisis situations "when there is compelling need for official action and no time to secure a warrant." Michigan v. Tyler, 436 U.S. 499, 509 (1978) (citing Warden v. Hayden, 387 U.S. 294 (1967)); see United States v. Irizarry, 673 F.2d 554, 557-58 (1st Cir. 1982). In determining whether there is an exigency sufficient to justify a warrantless search and seizure, the test is "whether there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant." United States v. Adams, 621 F.2d at 44. "The inquiry is necessarily 'fact-based.'" United States v. Donlin, 982 F.2d 31, 34 (1st Cir. 1992), abrogated on other grounds by Georgia v. Randolph, 547 U.S. 103 (2006), (quoting United States v. Beltrán, 917 F.2d 641, 642 (1st Cir. 1990)). "Factors [the court] must consider include the gravity of the underlying offense, whether a delay would pose a threat to police or the public safety, and whether there is a great likelihood that evidence will be destroyed if the search is delayed until a warrant can be obtained." United States v. Wilson, 36 F.3d 205, 209-10 (1st Cir. 1994) (citing United States v. Baldacchino, 762 F.2d 170, 176 (1st Cir. 1985)); see United States v. Curzi, 867 F.2d at 39.

CRIMINAL 07-0121 (ADC)			15

"There are four recognized categories of exigent circumstance: '(1) "hot pursuit" of a fleeing felon; (2) threatened destruction of evidence inside a residence before a warrant can be obtained; (3) a risk that the suspect may escape from the residence undetected; or (4) a threat, posed by a suspect, to the lives or safety of the public, the police officers, or to [himself].'" Fletcher v. Town of Clinton, 196 F.3d 41, 49 (1st Cir. 1999) (quoting Hegarty v. Somerset County, 53 F.3d 1367, 1374 (1st Cir. 1995)); see United States v. Martins, 413 F.3d 139, 146-47 (1st Cir. 2005). While the exigencies herein were the product of a fast-moving scenario and the government can rely on the exigent circumstances exception to justify the warrantless entry into the apartment, as in a scenario which I considered recently in another case, "Time was ample; manpower abounded; the premises were surrounded and secured; . . . the drama was being played out during daylight hours and in an urban setting. All in all, the situation was in good control. There is simply no credible evidence to suggest that obtaining a search warrant would have increased the risk of violence, escape, or destruction of evidence-or even delayed the search." United States v. Curzi, 867 F.2d at 42. The agents could have applied for a search warrant prior to seizing the toilet bowl and taking it to the police station. The officer could also have taken the toilet bowl out, secured the apartment and applied for a search warrant from a judge at the courthouse which was five minutes or less away. A

CRIMINAL 07-0121 (ADC)                    16

warrantless search is presumptively unreasonable under the Fourth Amendment. See California v. Acevedo, 500 U.S. 565, 593 (1991); see also United States v. López, 380 F.3d 538, 543 (1st Cir. 2004).  And of course, a warrantless search may be conducted if an exception to the search warrant requirement exists.  A search incident to an arrest has been recognized by the courts as a well settled exception to the search warrant requirement. United States v. Robinson, 414 U.S. 218, 224 (1973); United States v. Doward, 41 F.3d 789, 791 (1st Cir. 1994). The Supreme Court has held "that a search 'can be incident to an arrest only if it is substantially contemporaneous with the arrest and is confined to the immediate vicinity of the arrest.'"  Shipley v. California, 395 U.S. 818, 819-20 (1969) (quoting Stoner v. California, 376 U.S. 483, 486 (1964)).  Nevertheless, a warrantless search involving an intrusion into someone's home is presumed unreasonable under the Fourth Amendment. Groh v. Ramírez, 540 U.S. 551, 559 (2004); United States v. Tibolt, 72 F.3d 965, 968 (1st Cir. 1995).  While it may appear that an exception to the warrant requirement exists in the scenario played out at the Jardines de Guamaní housing project, it did not.  While it may be successfully argued that the officer was in hot pursuit of a fleeing felon, the pursuit was over, the felon secured, when the decision to take the toilet bowl was made. Rather than seeking a search warrant for a destructive search or a seizure warrant, the agent decided to go to the housing project administrator to get

CRIMINAL 07-0121 (ADC)                17

permission to take the toilet rather than to ask someone in that apartment, like the defendant or his mother, its inhabitants, for permission to take the toilet, futile as it might be. There was no threatened destruction of evidence inside the residence before a warrant could be obtained. See United States v. Irizarry, 673 F.2d at 559-60. The agent was certain the drugs were stuck in the toilet; the toilet could have been secured in the apartment, including lifting it off its base, and a search warrant could have been applied in order to conduct what the agent obviously knew would be a destructive search. Rather, the agents asked a third party who must have some ethereal connection to the toilet located inside the defendant's apartment, for permission to take the toilet, convenient for the police but contrary to the warrant requirement of the Fourth Amendment. The arresting officer ignored the concept of any privacy expectation that the defendant had in his own toilet, reaching the anomalous conclusion that a project administrator had superior or equal dominion over the toilet than defendant or his mother.

Courts have adopted a two-prong test in determining whether a defendant has standing to suppress evidence. See Smith v. Maryland, 442 U.S. 735, 740 (1979). A defendant has to demonstrate 1) "that he personally has an expectation of privacy in the place searched, and [2)] that his expectation is reasonable." Minnesota v. Carter, 525 U.S. 83, 88 (1998). Said subjective expectation of privacy must be one that society is willing to recognize as

CRIMINAL 07-0121 (ADC)                18

objectively reasonable.  See United States v. Mancini, 8 F.3d 104, 107 (1st Cir. 1993) (citing California v. Greenwood, 486 U.S. 35, 39 (1988)).  The removal of a toilet to conduct a destructive search as a matter of convenience goes against the grain of the Fourth Amendment's warrant requirement.  Taking the toilet was an extreme intrusion into the Fourth Amendment rights of the defendant, a right which could have easily been preserved with the application for a search warrant.  See, e.g., United States v. López, 989 F.2d 24, 27 (1st Cir. 1993).  There was no risk that the defendant might escape from the residence undetected, and there was no  threat  posed by the defendant to the lives or safety of the public, the police officers, or to himself, related to the seizure of the toilet bowl.

## V.  CONCLUSION

In view of the above, I recommend that the motion to suppress be GRANTED in relation to the October 22, 2003 seizure.  In relation to the July 31, 2003 seizure, there was sufficient information in the collective knowledge of the officers at the Jardines de Guamaní Housing Project to determine that a crime was being committed and that the defendant was committing that crime.  Therefore, I recommend that the motion to suppress evidence seized on July 31, 2003 be DENIED.

Under the provisions of Rule 72(d), Local Rules, District of Puerto Rico, any party who objects to this report and recommendation must file a written objection

thereto with the Clerk of this Court within ten (10) days of the party's receipt of this report and recommendation. The written objections must specifically identify the portion of the recommendation, or report to which objection is made and the basis for such objections. Failure to comply with this rule precludes further appellate review. See Thomas v. Arn, 474 U.S. 140, 155 (1985); Davet v. Maccorone, 973 F.2d 22, 30-31 (1st Cir. 1992); Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988); Borden v. Sec'y of Health & Human Servs., 836 F.2d 4, 6 (1st Cir. 1987); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir. 1980).

At San Juan, Puerto Rico, this 18th day of January, 2008.

S/ JUSTO ARENAS
Chief United States Magistrate Judge